U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JAN 1 3 2006

CLERK, U.S. DISTRICT COURT
By_____
Deputy

ORIGINAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| FRANCES NYSTROM, Derivatively On Behalf of MANNATECH, INC., ) ) ) | Case No. |
| Plaintiff, ) ) | **3-06 CV-0093 G** |
| vs. ) ) | 226901 |
| SAMUEL L. CASTER, TERRY L. PERSINGER, STEPHEN D. FENSTERMACHER, JOHN STUART AXFORD, J. STANLEY FREDRICK, GERALD E. GILBERT, ALAN D. KENNEDY, MARLIN RAY ROBBINS, PATRICIA A. WEIR AND DONALD A. BUCHHOLZ, Defendants, ) ) ) ) ) ) ) ) ) ) | |
| -and- ) ) | |
| MANNATECH, INCORPORATED, a Texas corporation, ) ) ) | |
| Nominal Defendant. ) | JURY TRIAL DEMAND |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

### NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Mannatech, Incorporated ("Mannatech" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between August 10, 2004 and the present (the "Relevant Period") and that have caused substantial losses to Mannatech and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

3.      This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

4.      Venue is proper in the Court pursuant to 28 U.S.C. §1391(a) because nominal defendant Mannatech is headquartered in this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## SUMMARY OF THE ACTION

5.      During the Relevant Period, defendants caused or allowed Mannatech's shares to trade at an artificially inflated level through the issuance of false and misleading press releases regarding the Company's business and prospects and by concealing improprieties by sales associates, which were allowed and encouraged by the defendants.  This caused Mannatech's stock to trade as high as $26.04 per share during the Relevant Period.  Defendants took advantage of this inflation, selling or otherwise disposing of 746,852 shares of their Mannatech stock then valued at more than $11 million.

6.      On May 9, 2005, *Barron's* published a story on Mannatech detailing Chief Executive Officer ("CEO") Samuel L. Caster's history and questioning the sale associates' methods and their "seemingly irrepressible inclination ... to make extraordinary therapeutic claims for their supplements," which had "irked some foreign regulators."  The story also discussed a civil suit filed in Los Angeles County against Mannatech for "'negligent

misrepresentation'" and "'conspiracy to commit fraud'" stemming from alleged misconduct by its sales associates. The article demonstrated that the Company's associates outlandish claims were thus known to the individual defendants and, at a minimum, tacitly encouraged.

7. On this news, Mannatech's stock fell to as low as $11.64 per share on May 10, 2005, before closing at $12.15 per share on volume of 2.2 million shares.

## THE PARTIES

8. Plaintiff Nystrom is, and was at times relevant hereto, an owner and holder of Mannatech common stock. Plaintiff is a citizen of California.

9. Nominal defendant Mannatech is a corporation organized and existing under the laws of the state of Texas with its headquarters located at 600 S. Royal Lane, Suite 200, Coppell, Texas. Mannatech develops nutritional supplements, topical products and weight-management products. Its products are designed to support cell-to-cell communication, the immune system, the endocrine system, skin and health, as well as nutritional support during weight loss.

10. Defendant Samuel L. Caster ("Caster") is, and at all times relevant hereto was, Chairman, CEO and a director of Mannatech. Because of Caster's positions, he knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' ("Board") meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Caster participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:04 Mannatech paid defendant Caster $1,004,807 in salary, bonus and other compensation, and granted him 200,000 options to purchase Mannatech stock in FY:03. During the Relevant Period, Caster sold 180,000 shares of Mannatech stock for proceeds of $478,800.00. Defendant Caster is a citizen of Texas.

11.     Defendant Terry L. Persinger ("Persinger") is, and at all times relevant hereto was, President, Chief Operating Officer ("COO") and a director of Mannatech.  Because of Persinger's positions, he knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Persinger participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:04 Mannatech paid defendant Persinger $521,783 in salary, bonus and other compensation. During the Relevant Period, Persinger sold 178,100 shares of Mannatech stock for proceeds of $3,747,203.00. Defendant Persinger is a citizen of Texas.

12.     Defendant Stephen D. Fenstermacher ("Fenstermacher") is, and at all times relevant hereto was, Senior Vice President of Accounting and Chief Financial Officer ("CFO") of Mannatech.   Because of Fenstermacher's positions, he knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Fenstermacher participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:04 Mannatech paid defendant Fenstermacher $418,512 in salary, bonus and other compensation. Defendant Fenstermacher is a citizen of Texas.

13.     Defendant John Stuart Axford ("Axford") is, and at all times relevant hereto was, a director of Mannatech.   Because of Axford's position, he knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and

connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Axford participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Axford sold 49,400 shares of Mannatech stock for proceeds of $792,870.00. Defendant Axford is a citizen of the United Kingdom.

14.     Defendant J. Stanley Fredrick ("Fredrick") is, and at all times relevant hereto was, a director of Mannatech. Because of Fredrick's position, he knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Fredrick participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Fredrick sold 324,352 shares of Mannatech stock for proceeds of $6,084,786.93. Defendant Fredrick is a citizen of Texas.

15.     Defendant Gerald E. Gilbert ("Gilbert") is, and at all times relevant hereto was, a director of Mannatech. Because of Gilbert's position, he knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Gilbert participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Gilbert is a citizen of Maryland.

16.     Defendant Alan D. Kennedy ("Kennedy") is, and at all times relevant hereto was, a director of Mannatech. Because of Kennedy's position, he knew the adverse, non-public

information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Kennedy participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Kennedy sold 15,000 shares of Mannatech stock for proceeds of $309,505.24.  Defendant Kennedy is a citizen of Florida.

17.     Defendant Marlin Ray Robbins ("Robbins") is, and at all times relevant hereto was, a director of Mannatech.  Because of Robbins' position, he knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Robbins participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Robbins is a citizen of Texas.

18.     Defendant Patricia A. Weir ("Weir") is, and at all times relevant hereto was, a director of Mannatech.  Because of Weir's position, she knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Weir participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Weir is a citizen of Illinois.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

19.     Defendant Donald A. Buchholz ("Buchholz") is a director of Mannatech and has been since October 2004.  Because of Buchholz's position, he knew the adverse, non-public information about the business of Mannatech, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Buchholz participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Buchholz is a citizen of Texas.

20.     The defendants identified in ¶¶10, 13-19 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶10-12 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶10, 11, 13, 14, 16 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

21.     By reason of their positions as officers, directors and/or fiduciaries of Mannatech and because of their ability to control the business and corporate affairs of Mannatech, the Individual Defendants owed Mannatech and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Mannatech in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Mannatech and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

22.     Each director and officer of the Company owes to Mannatech and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the

Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

23.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Mannatech, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.    Because of their advisory, executive, managerial and directorial positions with Mannatech, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Mannatech.

24.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Mannatech, and was at all times acting within the course and scope of such agency.

25.    To discharge their duties, the officers and directors of Mannatech were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.    By virtue of such duties, the officers and directors of Mannatech were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Mannatech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

26.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Mannatech, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Mannatech's Board during the Relevant Period.

27.     The Individual Defendants breached their duties of loyalty and good faith by causing or allowing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant

Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Mannatech has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending Mannatech and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

28.    Moreover, these actions have irreparably damaged Mannatech's corporate image and goodwill. For at least the foreseeable future, Mannatech will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Mannatech's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

29.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

30.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Mannatech and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Mannatech, regarding the Individual Defendants' management of Mannatech's operations, the Company's financial health and stability, and future business

prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

31.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least August 2004 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Mannatech was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Mannatech's financial performance and future business prospects, as alleged herein.

32.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Mannatech common stock so they could: (i) dispose of over $11 million of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) continue perpetrating a false image of success to current and future investors.

33.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

34.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

35. Mannatech began operations as a wellness solutions provider in November 1993 and currently operates in the United States, Canada, Australia, the United Kingdom, Japan, New Zealand, and the Republic of Korea, herein referred to as South Korea. Mannatech develops nutritional supplements, topical products, and weight-management products. Its products are designed to support cell-to-cell communication, the immune system, the endocrine system, skin, and health, as well as nutritional support during weight loss. The Company provides various nutritional supplements for overall health and wellness; wellness management products to support and maintain specific areas of the body; lifestyle solutions to further support specific physiological functions that need additional nutritional support; sports performance nutrition products that provide nutrition to support physical performance and maintain muscle mass; a body system that focuses on various aspects of nutrition and weight management; skin care solutions, which are designed to strengthen the skin's own natural texture, softness, and elasticity, as well as to deliver vital antioxidants to the skin; and children's growth essentials for their overall health and wellness.

36. Mannatech operates as a single segment and primarily sells its products and starter and renewal packs through a network of hundreds of thousands of independent associates and members who have purchased Mannatech's products within the last twelve months. Mannatech also offers sales aids for its associates, which include enrollment and renewal packs, orientation and training programs, brochures, audio and videotapes, web-based data management tools, and personalized website development.

37. On March 15, 2004, the Individual Defendants caused or allowed Mannatech to file its Form 10-K for 2003 with the SEC which was certified and signed by defendants Caster



and Fenstermacher. The filing emphasized the important role its associates and members play in marketing the Company's products:

> Mannatech believes network-marketing is an effective communication channel for its business and products. Network-marketing allows Mannatech to effectively educate consumers about the unique potential benefits of its proprietary products, as well as the unique science of its products. Additionally, Mannatech believes network-marketing allows it to introduce products into the marketplace more quickly and at a lower cost than other more conventional marketing methods. Further, Mannatech believes network-marketing allows its independent associates to supplement their income and develop financial freedom by building their own businesses.

38.     Mannatech's success as a business was dependant on its associates marketing. The Individual Defendants realized this and closely monitored the sales claims made by the Company's associates to determine which marketing programs were most successful. The Form 10-K further stated, in pertinent part, as follows:

> *High-Caliber, Industry-Leading Associates*. Mannatech's associates are comprised of many skillful, hard working, high-caliber and innovative thinkers. Some associates have been associated with the network-marketing industry for decades and have been with Mannatech since its beginning. *To capitalize on its associates' wealth of knowledge, Mannatech sponsors a 10-member panel of associates, called the Associate Council, to help relay associates' needs. Each associate member is elected by the associate base to serve a three-year term. The Associate Council meets with Mannatech's senior management at least four times a year to recommend changes, discuss issues, and provide new ideas or concepts*. Mannatech also believes it provides its associates with a full spectrum of innovative systems and a robust and efficient pipeline of quality-driven nutritional supplements aimed at maintaining optimal health and wellness and increasing opportunities for its associates. In addition, Mannatech listens to its associates, values their opinions, and financially rewards them for their loyalty and innovative thinking through its global associate career and compensation plan and various other incentives.

39.     Investors were assured that Mannatech adequately monitored its associates' advertising to make sure it was consistent with Company policies:

> **Management of Associates**. *Mannatech takes an active role in the oversight of its associates*. Mannatech tries to ensure that its associates' conduct complies with applicable laws and regulations governing the sale of its products and the promotion of its business opportunities by contractually binding associates to abide by Mannatech's associate policies and procedures. Mannatech provides each associate with a copy of its policies and procedures upon signing up as an associate and distributes changes to its policies and procedures that must be followed in order to remain compliant with respect to Mannatech's policies and procedures. In addition to publishing and distributing its policies and procedures, Mannatech also publishes the changes in its associate newsletter, posts the

- 13 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

changes on its corporate website, and announces the changes at various educational meetings, seminars and webcasts. *Furthermore, Mannatech's legal/compliance department periodically monitors its associates' websites for content.* In an effort to decrease the number of independent websites owned by associates and to preserve and protect its trademarks, Mannatech offers Mannapages(TM), a standardized, personal, Internet website program created to help associates with their sales efforts, provide consistent standardized information and education, and assist Mannatech in monitoring its associates' websites.

Mannatech's legal/compliance program also depends on associate self-regulation. When a complaint is filed against an associate, the legal/compliance department conducts an investigation of the allegations by obtaining a written response from associate and witness statements, if applicable. Depending on the nature of the violation, Mannatech may suspend and/or terminate the non-compliant associates' rights and may impose various sanctions, including warnings, probation, termination of associate status, and withholding commissions until the complaint is rectified. Mannatech's legal/compliance department, in cooperation with other departments and associates, periodically evaluates the conduct of its associates and the need for the new and revised policies and procedures. Mannatech's compliance program assists in maintaining associate ethics and helps associates in their sales efforts. Mannatech also sponsors continuing education to ensure that its associates understand and abide by Mannatech's associate policies and procedures.

40. The Form 10-K was signed pursuant to the requirements of the Securities Exchange Act of 1934 by defendants Caster, Persinger, Fenstermacher, Fredrick, Wier, Kennedy, Gilbert, Axford and Robbins. Further, the Form 10-K was certified pursuant to Section 302 of the Sarbanes Oxley Act of 2002 by defendants Caster and Fenstermacher. The certifications provided in part:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

41. In fact, as would be shown later in the *Barron's* article, Mannatech failed consistently to stop the "extravagant" claims by associates.

## IMPROPER STATEMENTS

42. The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Mannatech a duty to insure that the Company's public statements fairly presented, in all

material respects, the extent of the Company's oversight of its associates and their marketing techniques for Mannatech products, which is the most important aspect of Mannatech's business, as well as all other issues material to the Company's operations. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements. Defendants Caster, Persinger and Fenstermacher, as officers of Mannatech, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Caster, Persinger, Fenstermacher, Axford, Buchholz, Fredrick, Gilbert, Kennedy, Robbins and Weir, as directors of Mannatech had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of Committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Mannatech to the investing public and the Company's shareholders during the Relevant Period.

## REASONS THE STATEMENTS WERE IMPROPER

43. On August 10, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Mannatech Announces Record Quarterly Sales, Net Income and E.P.S." The press release stated in part, in pertinent part, as follows:

> Mannatech, Incorporated today announced record sales and net income for its second quarter ended June 30, 2004. For the three months ended June 30, 2004, net sales reached $74.3 million, which was an increase of 59.8% from $46.5 million for the same period in 2003 and net income increased by 376.1% to $5.6 million or $0.20 earnings per share (diluted), as compared to $1.2 million or $0.04 earnings per share (diluted) for the same period in 2003. For the first six months of 2004, net sales increased by 52.5% to reach $132.7 million and net income increased to $8.7 million, or $0.32 earnings per share (diluted), compared to sales of $87.0 million and net income of $2.6 million, or $0.10 earnings per share (diluted) for the same period in 2003. Net sales by country for the three months ended June 30, 2004, in millions, and as a percentage of total net sales are as follows:

|  | United States | Canada | Australia | United Kingdom |
|---|---|---|---|---|
| 2004 | $49.5  66.6% | $5.8  7.8% | $7.4  10.00 | $2.6  3.5% |
| 2003 | $31.7  68.2% | $4.2  9.0% | $3.4  7.3% | $1.0  2.2% |
| % increase | | | | |
| 2004 over 2003 | 56.2% | 38.1% | 117.6% | 160.0% |

|  | Japan | New Zealand | Total |
|---|---|---|---|
| 2004 | $5.9  7.9% | $3.1  4.2% | $74.3  100% |
| 2003 | $4.6  9.9% | $1.6  3.4% | $46.5  100% |
| % increase | | | |
| 2004 over 2003 | 28.3% | 93.8% | 59.8% |

Commenting on the results, Mannatech Chairman and CEO Sam Caster said, *"Our record performance, with sales growth of 59.8% and net income increasing 376.1%, is a testament to Mannatech's products, our Associates and the future of the Company.* Along with this tremendous growth in our current markets, we are excited about introducing Mannatech products to South Korea when we plan to open for business in September 2004. Another sign of our strong trend is our increase in pack sales, which increased by 101.8% in the second quarter of 2004 as compared to 2003. Pack sales, which are regarded as a leading indicator for Mannatech, include signups, renewals, and upgrades, and our higher priced pack choices include various product selections as well as sales materials. New Associates are joining our company at a record rate, and we look forward to adding South Korea to our family of markets."

44.     On November 9, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Mannatech, Inc. Announces Record Quarterly Sales and Earnings" in which it announced its record quarterly sales and earnings. The release stated in pertinent part, as follows:

Mannatech, Incorporated today announced record sales and earnings for its third quarter ended September 30, 2004 as compared to the same period in 2003. For the three month period ended September 30, 2004, sales reached $77.6 million, a new quarterly sales record for Mannatech, which was an increase of $27.8 million, or 56.1%, as compared to the prior year. Net income rose to $6.8 million, which more than doubled versus the same period in 2003. Net income as a percentage of net sales increased to 8.8% of net sales as compared to 5.8% for the same period in 2003. Earnings per share (diluted) for the third quarter of 2004 increased to $0.25 per share, which was an increase of 127.3% as compared to the prior year.

Sales for the nine months ended September 30, 2004 were $210.2 million, up 53.8% versus 2003. Net Income reached $15.5 million, which was an increase of $10.0 million or 183.4% over last year, while earnings per share (diluted) for the nine months ended September 30, 2004 was $0.57, again of 171.4% as compared to the same period in 2003.

The third quarter results represented a new quarterly record and marks Mannatech's eighth consecutive quarter of successive sales increases, during which time sales have more than doubled. Net sales by country for the three

months ended September 30, 2004, in millions, and as a percentage of total net sales, as well as the number of new and continuing Mannatech independent Associates and Members who purchased Mannatech's products within the last 12 months were as follows:

|  | United States | Canada | Australia | United Kingdom |
|---|---|---|---|---|
| 2004 | $51.30 | $5.60 | $8.00 | $2.60 |
|  | 66.10% | 7.20% | 10.30% | 3.30% |
| 2003 | $33.40 | $4.10 | $4.20 | $1.30 |
|  | 67.20% | 8.20% | 8.50% | 2.60% |

\* \* \*

Sam Caster, Chairman and CEO of Mannatech, commented on the records [sic] setting results. ***"We have seen our business grow rapidly and successfully for the past eight quarters, through the tremendous labors of our Associates around the world in concert with the highly focused and motivated activities of our corporate staff.*** We have also seen our sales double since the string of successive quarterly increases began in the fourth quarter of 2002. This strong trend is rewarding to us, and yet we believe that we have just begun to realize the potential of the products Mannatech brings to the world. We intend to continue our growth into new markets around the globe, and we welcome into the Mannatech family the Associates in our newest market in South Korea, which opened in September, 2004."

45. On March 9, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Mannatech Inc. Announces Another Record-Breaking Year of Annual Sales & Profit." The press release stated, in pertinent part, as follows:

Mannatech, Incorporated today announced the achievement of new annual sales and profit records for 2004. Consolidated net sales reached a new high of $294.5 million, an increase of $103.5 million, or 54.2%, as compared to 2003. Mannatech's net income of $19.6 million more than doubled as compared to the prior year with an increase of $10.8 million, or 122.4%, and earnings per share of $0.71 (diluted) increased 108.8% as compared to 2003. Annual historical sales by market are shown in the table below.

|  | 2002 | | 2003 | | 2004 | |
|---|---|---|---|---|---|---|
| United States | $105.0 | 74.5% | $127.8 | 67.0% | $192.5 | 65.40% |
| Canada | $16.4 | 11.6% | $16.7 | 8.7% | $22.2 | 7.50% |
| Australia | $6.6 | 4.7% | $15.6 | 8.2% | $30.6 | 10.40% |
| United Kingdom | $1.6 | 1.1% | $5.0 | 2.6% | $10.5 | 3.60% |
| Japan | $9.0 | 6.4% | $18.6 | 9.7% | $24.5 | 8.30% |
| New Zealand | $2.3 | 1.7% | $7.3 | 3.8% | $12.9 | 4.40% |
| South Korea | $-- | --% | $-- | --% | $1.3 | 0.40% |
| Total | $140.9 | 100.0% | $191.0 | 100.0% | $294.5 | 100.00% |

Fourth quarter results also included a new consolidated net sales record of $84.2 million for Mannatech, which was an increase of $29.9 million, or 55.1%, as compared to the same period in 2003. Fourth quarter net income was $4.0 million, or $0.15 earnings per share (diluted), which was an increase of 21.9 % over the fourth quarter of 2003. Net income for the fourth quarter included one-time non-cash charge, totaling $3.0 million, or $0.07 per diluted share, net of tax, related to Mr. Caster's sale of 180,000 shares of his common stock to a former employee, Dr. H. Reginald McDaniel. The sale was for a price that was below the fair market value of Mannatech's stock on the date of the sale. Quarterly sales volumes by market are shown in the table below.

| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| United States | $36.8 | 63.0% | $49.5 | 66.6% | $51.3 | 66.1% | $54.8 | 65.2% |
| Canada | $4.7 | 8.0% | $5.8 | 7.8% | $5.6 | 7.2% | $6.1 | 7.2% |
| Australia | $6.5 | 11.1% | $7.4 | 10.0% | $8.0 | 10.3% | $8.8 | 10.4% |
| United Kingdom | $2.8 | 4.8% | $2.6 | 3.5% | $2.6 | 3.3% | $2.5 | 3.0% |
| Japan | $5.0 | 8.6% | $5.9 | 7.9% | $6.5 | 8.4% | $7.1 | 8.4% |
| New Zealand | $2.6 | 4.5% | $3.1 | 4.2% | $3.4 | 4.4% | $3.8 | 4.5% |
| South Korea | $-- | --% | $-- | --% | $0.2 | 0.3% | $1.1 | 1.3% |
| Total | $58.4 | 100.0% | $74.3 | 100.0% | $77.6 | 100.0% | $84.2 | 100.0% |

Mr. Caster commented on the new all time high record sales volumes for the periods, stating, "We are extremely pleased with the financial gains and continued strength shown throughout 2004, and also are delighted with the impressive sales momentum generated by our 369,000 current independent Associates and members around the world. Our groundbreaking glyconutritional technology continues to bring hope, health, and opportunity to people in record numbers and we believe that we are just scratching the surface of the potential of Mannatech."

46.   On March 10, 2005, the Individual Defendants caused or allowed the Company to issue an updated press release entitled "Mannatech Inc. Announces Another Record-Breaking Year of Annual Sales & Profit – Updated." The press release stated, in pertinent part, as follows:

Mannatech, Incorporated today announced the achievement of new annual sales and profit records for 2004. Consolidated net sales reached a new high of $294.5 million, an increase of $103.5 million, or 54.2%, as compared to 2003. Mannatech's net income of $19.6 million more than doubled as compared to the prior year with an increase of $10.8 million, or 122.4%, and earnings per share of $0.71 (diluted) increased 108.8% as compared to 2003. Annual historical sales by market are shown in the table below.

| | 2002 | | 2003 | | 2004 | |
|---|---|---|---|---|---|---|
| United States | $105.0 | 74.5% | $127.8 | 67.0% | $192.5 | $65.4% |
| Canada | $16.4 | $11.6% | $16.7 | $8.7% | $22.2 | 7.5% |
| Australia | $6.6 | 4.7% | $15.6 | 8.2% | $30.6 | 10.4% |
| United Kingdom | $1.6 | 1.1% | $5.0 | 2.6% | $10.5 | 3.6% |
| Japan | $9.0 | 6.4% | $18.6 | 9.7% | $24.5 | 8.3% |
| New Zealand | $2.3 | 1.7% | $7.3 | 3.8% | $12.9 | 4.4% |

| | | | | | | |
|---|---|---|---|---|---|---|
| South Korea | $-- | --% | $-- | --% | $1.3 | 0.4% |
| Total | $140.9 | 100.0% | $191.0 | 100.0% | $294.5 | 100.0% |

Fourth quarter results also included a new consolidated net sales record of $84.2 million for Mannatech, which was an increase of $29.9 million, or 55.1%, as compared to the same period in 2003. Fourth quarter net income was $4.0 million, or $0.15 earnings per share (diluted), which was an increase of 21.9 % over the fourth quarter of 2003. Net income for the fourth quarter included one-time non-cash charge, totaling $3.0 million, or $0.07 per diluted share, net of tax, related to Mr. Caster's sale of 180,000 shares of his common stock to a former employee, Dr. H. Reginald McDaniel. The sale was for a price that was below the fair market value of Mannatech's stock on the date of the sale. Quarterly sales volumes by market are shown in the table below.

| | First Quarter | | Second Quarter | | Third Quarter | | Fourth Quarter | |
|---|---|---|---|---|---|---|---|---|
| United States | $36.8 | 63.0% | $49.5 | 66.6% | $51.3 | 66.1% | $54.8 | 65.2% |
| Canada | $4.7 | 8.0% | $5.8 | 7.8% | $5.6 | 7.2% | $6.1 | 7.2% |
| Australia | $6.5 | 11.1% | $7.4 | 10.0% | $8.0 | 10.3% | $8.8 | 10.4% |
| United Kingdom | $2.8 | 4.8% | $2.6 | 3.5% | $2.6 | 3.3% | $2.5 | 3.0% |
| Japan | $5.0 | 8.6% | $5.9 | 7.9% | $6.5 | 8.4% | $7.1 | 8.4% |
| New Zealand | $2.6 | 4.5% | $3.1 | 4.2% | $3.4 | 4.4% | $3.8 | 4.5% |
| South Korea | $-- | --% | $-- | --% | $0.2 | 0.3% | $1.1 | 1.3% |
| Total | $58.4 | 100.0% | $74.3 | 100.0% | $77.6 | 100.0% | $84.2 | 100.0% |

Mr. Caster commented on the new all time high record sales volumes for the periods, stating "We are extremely pleased with the financial gains and continued strength shown throughout 2004, and also are delighted with the impressive sales momentum generated by our 369,000 current independent Associates and members around the world. Our groundbreaking glyconutritional technology continues to bring hope, health, and opportunity to people in record numbers and we believe that we are just scratching the surface of the potential of Mannatech."

47.     On March 31, 2005, the Individual Defendants caused or allowed Mannatech to file its Form 10-K for 2004, which was certified and signed by defendants Caster and Fensterbacher. The filing again referenced the important role its associates play in marketing the Company's products:

All of Mannatech's associates are independent contractors who are contractually bound to follow certain policies and procedures. These policies and procedures help Mannatech ensure the legality of its independent associates' activities by requiring associates to comply with regulatory guidelines and act in a consistent, professional manner.

48.     Investors were assured that Mannatech was taking an active role in monitoring its associates, making sure their conduct was consistent with Company policies:

*__Management of Independent Associates__*. Mannatech takes an active role in the oversight of its independent associates. Mannatech tries to ensure that its

independent associates' conduct complies with applicable laws and regulations governing the sale of its products and the promotion of its business opportunities by contractually binding its independent associates to abide by Mannatech's policies and procedures for its independent associates and members. Mannatech provides each independent associate with a copy of its policies and procedures upon signing up as an independent associate and uses various media formats to distribute changes to its policies and procedures that must be followed in order to remain compliant with respect to Mannatech's policies and procedures, including publishing the changes in a newsletter, posting the changes on its corporate website, and announcing the changes at various educational meetings, seminars, and webcasts. Furthermore, Mannatech's legal/compliance department periodically monitors its independent associates' websites for content. In an effort to decrease the number of independent websites owned by its independent associates and to preserve and protect its trademarks, Mannatech offers Mannapages(TM). Mannapages(TM) is a standardized personal Internet website program created to help its independent associates with their sales efforts, provide consistent standardized information and education, and assist Mannatech in monitoring websites of its independent associates.

49.     The Form 10-K was signed pursuant to the requirements of the Securities Exchange Act of 1934 by defendants Caster, Persinger, Fenstermacher, Fredrick, Wier, Kennedy, Gilbert, Axford, Buchholz and Robbins. Further, the Form 10-K was certified pursuant to Section 302 of the Sarbanes Oxley Act of 2002 by defendants Caster and Fenstermacher. The certifications provided in part:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

50.     On May 9, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Mannatech, Inc. Announces New First Quarter Records: Sales Increase 46%, E.P.S. up 55% records." The press release stated, in pertinent part, as follows:

> Mannatech, Inc. today announced record first quarter financial results. For the three months ended March 31, 2005, consolidated net sales increased 46% as compared to the prior year quarter to reach a new quarterly record of $85.1 million. In addition current independent Associates and members totaled 401,000 and reached a new record level. Net sales by country for the three months ended March 31, in millions, and as a percentage of net sales are as follows:

Net Sales in Dollars and as a Percentage of Consolidated Net Sales

| (in millions) | United States | Canada | Australia | United Kingdom |
|---|---|---|---|---|
| 2004 | $36.8 | $4.7 | $6.5 | $2.8 |
| 2005 | $56.1 | $6.7 | $8.1 | $2.4 |

| (in millions) | Japan | New Zealand | South Korea (a) | Total |
|---|---|---|---|---|
| 2004 | $5.0 | $2.6 | $-- | $58.4 |
| 2005 | $7.8 | $3.6 | $0.4 | $85.1 |

| | United States | Canada | Australia | United Kingdom |
|---|---|---|---|---|
| 2004 | 63.0% | 8.0% | 11.1% | 4.8% |
| 2005 | 65.9% | 7.9% | 9.5% | 2.8% |

| | Japan | New Zealand | South Korea (a) | Total |
|---|---|---|---|---|
| 2004 | 8.6% | 4.5% | -- | 100.0% |
| 2005 | 9.2% | 4.2% | 0.5% | 100.0% |

(a) South Korea began operations in September 2004.

The strong sales trend for the first quarter of 2005 resulted in record-setting sales and earnings as well as with net income of $4.7 million up 50% from a year ago and diluted earnings per share of $0.17, which increased by 55% as compared to $0.11 per share for the first quarter of 2004.

Sam Caster, Founder, Chairman, and Chief Executive Officer of Mannatech, commented on the quarterly results, saying, "We have now completed ten consecutive quarters of sales increases and during this period our quarterly volume has grown 245% to reach a new quarterly record of $85.1 million. Our current independent Associate count as of March 31, 2005 grew 210% over the same ten quarters. Our recent new product introduction of Advanced Ambrotose(TM) has become one of our best-sellers, since its introduction in March 2005. Our earnings are growing at an accelerated rate, and we have a new market opening planned in June 2005 with Taiwan and plan to distribute our products in Germany and Denmark later in 2005. We believe, the future has never looked better for Mannatech, and we intend to continue to build further on the successes of the past ten quarters."

51.     However, also on May 9, 2005, the shocking truth about Mannatech's true business prospects and the improprieties of its sales associates was revealed to the public. On that day, *Barron's* published a story on Mannatech which stated, in pertinent part, that:

But for all the surface flash, eye-popping financials and grand plans, Mannatech's allure steadily dims the more intensely one scrutinizes its provenance and how it makes its living.

More specifically, our skepticism grew as we examined the company's multilevel marketing structure, reviewed some of the extravagant claims of its sales people both here and abroad, and perused the complaints of the Texas attorney general's office about an earlier venture of Mannatech's chief exec, Samuel Caster.

A lot of the concerns sparked by our research into the company and its affairs find dramatic expression in a civil suit, filed in Los Angeles Superior Court, charging Mannatech and Caster with, among other things, "negligent misrepresentation" and "conspiracy to commit fraud." The company, let us hasten to add, denies all the allegations in that case and avers it deals severely with any misconduct by its sales associates.

Mannatech went public in February 1999 at $8. In the first days of trading, the stock ran wild, hitting an intraday high of $44.50. From there on, however, it was virtually all downhill. By May '01, shares were trading under $1, and for the next two years, they never got above $4 and change.

From the get-go, Mannatech's strategy has been two-pronged: to develop a proprietary line of supplements and a multilevel marketing organization to sell them. The hallmark of its multilevel marketing is that salespeople, called "associates," earn money not only by selling supplements, but also by recruiting other associates to sell supplements, who, in turn, are encouraged to recruit still more salespeople. In this fashion, the original associate builds what is called a downline network and, importantly, gets a financial cut from not only his own sales, but the sales of his entire network.

\* \* \*

An upbeat Texan with a bit of drawl, the 54-year-old Caster credits McAnalley and McDaniel with having "pioneered the science of glycomics."

"Glyco" is the Greek word for sugar, he explains, not the sweet kind, sucrose, but rather sugars that come from plants, like mannose from the aloe vera. With its "significant patents," Mannatech is on the forefront of a "brand new area of nutrition," Caster insists. But while Mannatech does have some foreign patents, in the U.S., according to the 10-K, it "continues to face the risk of its patent protection for Ambrotose complex being ultimately denied."

Unlike Carrington, which wanted to market its products as drugs and suffered devastating rebuffs by the Food and Drug Administration, Mannatech is selling Ambrotose only as a food supplement and so needs no blessing from regulators. However, the company is strictly prohibited from claiming Ambrotose "treats" or "cures" anything. Moreover, the Federal Trade Commission requires Mannatech to have "adequate substantiation" for its claims, meaning they must be based on "competent and reliable scientific evidence."

Associates receive clear guidelines about what they can claim, Caster asserts, and the company disciplines or dismisses those who break the rules.

Yet even the most cursory visit to the Websites of Mannatech associates reveals that these sites are replete with the most astonishing of claims. For example, one such Website, with no readily visible disclaimer, tells with graphic visuals and somewhat primitive prose the remarkable story of Jaclyn, a young woman suffering from multiple sclerosis. She is shown first sitting in a wheelchair and then, in a second photo, working out on a treadmill.

The text accompanying those starkly contrasting photos reads: "Shortly after being married, Jaclyn was faced with the greatest challenge of her life. The

excitement of being a newlywed was soon drowned out by the confinement to a wheelchair.... A friend introduced her to glyconutrients.... To everyone's amazement, Jaclyn became the fastest response to glyconutrients of anyone who has tried them with MS. The restoration of health usually takes several months with such a debilitating condition. For Jaclyn, within two weeks she was walking again."

Or jump to another Website and learn about Rikkea, born with cerebral palsy. The pitch comes presumably from her parents: "Our six-year-old daughter Rikkea could not walk or speak at the age of two due to brain damage caused by cerebral palsy.... She was having seizures, constant drooling from the mouth.... We were introduced to and gave her two capsules of glyconutrients a day in December 1998. After only one week, she got up and walked around the house!! She soon began speaking clearly in sentences too!!"

Close inspection of this site turns up a disclaimer, in small print, to the effect that the statements made have not been evaluated by the FDA and that Mannatech products are dietary supplements not intended to treat disease. But perhaps worth noting, this demur comes after pages and pages of testimonials about the remarkable effects of glyconutrients on a vast array of diseases, including arthritis, hepatitis, brain cancer, diabetes, subglottic hemangioma, prostate cancer and toxic-shock syndrome.

Here, as on a good many other associates' sites, people also can get info on the "amazing opportunity" to sell Mannatech's supplements. Such sites do double duty, by both selling the products and also recruiting foot soldiers for Mannatech's sales force.

The promotional spiel on this associate's site begins: "Think about this. If there is a product that could benefit every person on earth, is scientifically validated, is new, is essential like vitamins, is patented, and is only available from ONE company that has an upward business growth compared to that of Microsoft, that equates to a very significant opportunity." Bill Gates, are you listening?

In spite of flagrant flouting of the rules by salespeople, Mannatech maintains that it complies with applicable laws and regulations. Caster makes a sharp distinction between the company and its associates, conceding that from time to time the latter may make improper claims. "We're enforcing our policies," he insists, "but there's only so much we can do."

The seemingly irrepressible inclination of some Mannatech associates to make extraordinary therapeutic claims for the supplements has irked some foreign regulators. In New Zealand, the Medical Devices Safety Authority notified Mannatech that its salespeople were making unwarranted claims after newspaper articles in early 2003 described how Stephen Nugent, a Mannatech employee with Ph.D.s in psychology and "naturopathic medicine," had extolled the virtues of the supplements before packed crowds in several cities.

Speaking to some 500 people in an Auckland ballroom, Nugent is reported to have referred repeatedly to breast and child cancer, cited medical studies supporting the company's theories and implied he could be more specific except for fear of running afoul of the government and its regulatory bodies.

In addition, the New Zealand Press Association reported that Mannatech associates were allegedly claiming the supplements could treat HIV, cancer, cystic fibrosis, arthritis and Down syndrome.

Mannatech addressed the complaints from the New Zealand Medical Devices Safety Authority through its in-house "disciplinary procedure" and, as of last June, according to the 10-K, had satisfied the regulators.

In Australia, the Therapeutic Goods Administration continues to monitor the company and has required Mannatech to provide "compliance training" for associates for the next three years.

Symptomatic of what may have prompted such oversight were some dubious practices by a Mannatech associate, whose medical license was cancelled for two years in 2000 by the Australian Health Practitioner's Tribunal. According to the tribunal's report of its disciplinary action, the doctor, Ian Raddatz, who together with his wife had a sideline business selling Mannatech products, had told patients that the supplements could treat infertility, brain damage and cancer; had urged patients to use Mannatech supplements instead of their prescribed medications, and had tried to recruit a cancer patient's daughter as an associate, telling her: "These wonderful pills will ... work wonders on your mother's cancer."

Even more egregious are the allegations at the heart of a lawsuit filed Nov. 1, 2004, in a Los Angeles Superior Court by Chie Sasaki, mother of a child with Tay-Sachs disease. She accuses a Mannatech associate, Caster and Mannatech itself of, among other things, intentional infliction of emotional distress, negligent misrepresentation and conspiracy to commit fraud.

The charges stem from the alleged actions of a Mannatech associate and Sherman Oaks chiropractor, Victoria Arcadi, who treated Sasaki's son, Yasuhiro, after he was diagnosed with Tay-Sachs, a fatal ailment most common among Ashkenazi Jews. Arcadi has denied all the charges against her.

According to court papers, after an initial chiropractic exam in September 1996, Arcadi recommended that Sasaki's son, then three years and nine months old, be given Mannatech supplements. His mother added them to a complicated diet she was already feeding him based on a high-calorie soy-based formula. By being fed nine times a day, the boy managed to gain several pounds.

His mother subsequently gave Arcadi pictures of the boy to show his weight gain, solely for the purpose of his treatment and expecting them to be kept confidential. Yet without oral or written consent, the complaint continues, in May 1997 Arcadi showed photographs of a naked Yasuhiro to several hundred people at a Mannatech demonstration seminar.

A month later, when Yasuhiro's mother discovered her son's photos were being widely used at Mannatech sales meetings, she fired off a letter of protest directly to Samuel Caster, then Mannatech's president. According to the complaint, Mannatech and Caster denied responsibility.

In July 1997, the complaint continues, Yasuhiro's mother protested, on three separate occasions, to Arcadi, who, promised to protect Yasuhiro's privacy but did not return the photographs as requested.

A month later, Arcadi co-authored an article entitled "Case Study: Tay-Sachs Disease Improvement During Nutritional Supplementation" in the Journal of the American Nutraceutical Association, featuring Yasuhiro Sasaki and describing his dramatic improvement taking Mannatech supplements. Thanks apparently to the supplements, the authors reported, "the child is interacting with his environment and exhibiting physical and vocal communication."

Yet, according to the complaint, when the article was published in August 1997, Yasuhiro Sasaki was already dead.

After his death, his mother again demanded Mannatech, Caster and Arcadi stop using her son's likeness and story in marketing Mannatech products, and, according to the complaint, she was led to believe the objectionable distribution would stop.

But years later – in March 2004, to be precise – she received an e-mail from a woman in Mexico whose nephew was afflicted with Tay-Sachs. The woman had seen photographs depicting Yasuhiro's purported improvement using Mannatech products on a current Website, "with the clear inference," according to the complaint, "that Yasuhiro was alive and doing well some seven years after his actual death."

Caster adamantly denies that he or Mannatech had anything to do with distributing Yasuhiro's story or his photographs. "As a company, we never used the pictures," he stresses. But he concedes that some associates might still be using Yasuhiro's story and photos. "Once they get out there," he observes, "it's impossible to get them back."

So far, anyway, neither regulatory disapproval abroad nor wildly hyperbolic claims by associates on their Websites here have dampened the ardor of Mannatech users and associates (who often overlap) or slowed the company's vigorous growth.

And shareholders, as noted, have little reason to be displeased. Especially those shareholders who happen to be insiders. In the past 12 months, seven Mannatech insiders have sold more than 900,000 shares worth $18 million.

Two of the biggest sellers were Eileen Vennum and Bill McAnalley. Specifically, in just the past six months, Vennum sold over 85,000 shares worth more than $1.8 million; McAnalley sold 259,000 shares worth a cool $5.5 million.

Vennum is senior vice president of R&D at Mannatech. McAnalley is chief science officer, the company's R&D honcho. They are, pure and simple, Mannatech's top scientists, both named as inventors on a U.S. patent that is pending for Ambrotose Complex.

Nothing amiss in their selling stock, of course. But to a cynical eye, that they have sold in such quantity could easily be taken as hedging their bets.

52.     On this news, Mannatech's stock fell to as low as $11.64 per share on May 10, 2005 before closing at $12.15 per share on volume of 22 million shares.

**IMPROPER FINANCIAL REPORTING DURING THE RELEVANT PERIOD**

53.     As a result of the Individual Defendants' actions, Mannatech's market capitalization has been damaged by over $489 million.  At the same time that the defendants were causing Mannatech to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $11 million of their personally held stock.

**ILLEGAL INSIDER SELLING**

54.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Mannatech stock:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|------|------|--------|-------|----------|
| Samuel L. Caster | 12/22/2004 | 180,000 | $ 2.66 | $ 478,800.00 |
| | | **180,000** | | **$ 478,800.00** |
| | | | | |
| Terry L. Persinger | 11/29/2004 | 36,500 | $ 23.15 | $ 844,975.00 |
| | 11/24/2004 | 25,000 | $ 22.66 | $ 566,500.00 |
| | 11/18/2004 | 25,000 | $ 22.60 | $ 565,000.00 |
| | 11/15/2004 | 10,600 | $ 20.98 | $ 222,388.00 |
| | 11/12/2004 | 31,000 | $ 21.82 | $ 676,420.00 |
| | 10/18/2004 | 18,000 | $ 16.04 | $ 288,720.00 |
| | 10/15/2004 | 2,000 | $ 18.00 | $ 36,000.00 |
| | 10/14/2004 | 30,000 | $ 18.24 | $ 547,200.00 |
| | | **178,100** | | **$ 3,747,203.00** |
| | | | | |
| John Stuart Axford | 8/15/2005 | 49,400 | $ 16.05 | $ 792,870.00 |
| | | **49,400** | | **$ 792,870.00** |
| | | | | |
| J. Stanley Fredrick | 11/16/2004 | 100,327 | $ 22.03 | $ 2,210,203.81 |
| | 11/12/2004 | 17,600 | $ 21.90 | $ 385,440.00 |
| | 10/19/2004 | 49,700 | $ 16.17 | $ 803,649.00 |
| | 10/18/2004 | 25,700 | $ 16.17 | $ 415,569.00 |
| | 10/15/2004 | 72,725 | $ 16.73 | $ 1,216,689.25 |
| | 10/14/2004 | 2,000 | $ 17.94 | $ 35,880.00 |
| | 10/14/2004 | 1,000 | $ 17.99 | $ 17,990.00 |
| | 10/14/2004 | 2,000 | $ 18.09 | $ 36,180.00 |
| | 10/14/2004 | 1,502 | $ 17.91 | $ 26,900.82 |
| | 10/14/2004 | 1,998 | $ 17.90 | $ 35,764.20 |
| | 10/14/2004 | 1,200 | $ 17.85 | $ 21,420.00 |
| | 10/14/2004 | 4,200 | $ 18.03 | $ 75,726.00 |
| | 10/14/2004 | 2,500 | $ 18.05 | $ 45,125.00 |
| | 10/14/2004 | 300 | $ 18.06 | $ 5,418.00 |
| | 10/14/2004 | 1,300 | $ 18.04 | $ 23,452.00 |

|  | 10/14/2004 | 2,200 | $ | 18.01 | $ | 39,622.00 |
|---|---|---|---|---|---|---|
|  | 10/14/2004 | 14,362 | $ | 18.00 | $ | 258,516.00 |
|  | 10/14/2004 | 10,991 | $ | 18.10 | $ | 198,937.10 |
|  | 10/14/2004 | 1,500 | $ | 18.11 | $ | 27,165.00 |
|  | 10/14/2004 | 3,500 | $ | 18.15 | $ | 63,525.00 |
|  | 10/14/2004 | 1,200 | $ | 18.28 | $ | 21,936.00 |
|  | 10/14/2004 | 300 | $ | 18.26 | $ | 5,478.00 |
|  | 10/14/2004 | 700 | $ | 18.24 | $ | 12,768.00 |
|  | 10/14/2004 | 1,000 | $ | 18.45 | $ | 18,450.00 |
|  | 10/14/2004 | 1,000 | $ | 18.25 | $ | 18,250.00 |
|  | 10/14/2004 | 3,547 | $ | 18.25 | $ | 64,732.75 |
|  |  | **324,352** |  |  | $ | **6,084,786.93** |
| Alan D. Kennedy | 11/12/2004 | 4,600 | $ | 22.01 | $ | 101,246.00 |
|  | 11/12/2004 | 300 | $ | 22.03 | $ | 6,609.00 |
|  | 11/12/2004 | 100 | $ | 22.09 | $ | 2,209.00 |
|  | 11/12/2004 | 100 | $ | 22.11 | $ | 2,211.00 |
|  | 11/12/2004 | 100 | $ | 22.02 | $ | 2,202.00 |
|  | 11/12/2004 | 261 | $ | 22.02 | $ | 5,747.22 |
|  | 11/12/2004 | 100 | $ | 22.23 | $ | 2,223.00 |
|  | 11/12/2004 | 100 | $ | 22.08 | $ | 2,208.00 |
|  | 11/12/2004 | 200 | $ | 22.03 | $ | 4,406.00 |
|  | 11/12/2004 | 300 | $ | 22.01 | $ | 6,603.00 |
|  | 11/12/2004 | 500 | $ | 22.00 | $ | 11,000.00 |
|  | 11/12/2004 | 600 | $ | 22.20 | $ | 13,320.00 |
|  | 11/12/2004 | 100 | $ | 22.18 | $ | 2,218.00 |
|  | 11/12/2004 | 200 | $ | 22.04 | $ | 4,408.00 |
|  | 10/14/2004 | 1,825 | $ | 19.25 | $ | 35,131.25 |
|  | 10/14/2004 | 2,000 | $ | 19.47 | $ | 38,940.00 |
|  | 10/14/2004 | 2,439 | $ | 18.93 | $ | 46,170.27 |
|  | 10/14/2004 | 500 | $ | 19.29 | $ | 9,645.00 |
|  | 10/14/2004 | 400 | $ | 19.28 | $ | 7,712.00 |
|  | 10/14/2004 | 275 | $ | 19.26 | $ | 5,296.50 |
|  |  | **15,000** |  |  | $ | **309,505.24** |
|  |  | **746,852** |  |  | $ | **11,413,165.17** |

## DERIVATIVE ALLEGATIONS

55.     Plaintiff brings this action derivatively in the right and for the benefit of Mannatech to redress injuries suffered, and to be suffered, by Mannatech as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.

Mannatech is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

56.     Plaintiff will adequately and fairly represent the interests of Mannatech in enforcing and prosecuting its rights.

57.     Plaintiff is and was an owner of the stock of Mannatech during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

58.     On September 14, 2005, plaintiff made a demand upon Mannatech's Board pursuant to Texas Business Corporations Act Article 5.14(C), to commence legal action on behalf of Mannatech against those responsible for disabling the Company through accounting improprieties and for destroying its reputation and goodwill. Plaintiff demanded that the Board commence legal action against Mannatech's top officers and directors, for their breaches of fiduciary duty in connection with their abuse of their controlling positions at, and gross mismanagement of, Mannatech. A true and correct copy of plaintiff's demand letter is attached hereto as Exhibit A.

59.     As grounds for the demand, plaintiff detailed how the Individual Defendants had breached their fiduciary duties of loyalty, due care, and good faith by causing and/or permitting Mannatech to engage in unlawful conduct, by failing to properly oversee the Company to prevent such misconduct, for causing the Company to issue false statements, and for exposing the Company to staggering potential liability for the foregoing violations. Plaintiff specifically detailed how the Board and officers knew or should have known: (i) the Company was at least tacitly encouraging associates to make misleading claims about the Company's products; (ii) contrary to defendants' claims of fiscal 2005 growth and profitability, the Company would experience much worse results once its misleading practices were disclosed; (iii) the Company lacked the controls to prevent false statements by associates; and (iv) the Company's earnings were based on misleading claims about the efficacy of its products. Further, plaintiff explained how the Individual Defendants caused or allowed Mannatech to disseminate false and misleading

press releases and public filings which omitted this material adverse non-public information. The demand letter also requested that the Board initiate an action against the Individual Defendants for recovery of millions of dollars in salaries, bonuses, retirement benefits and long term compensation. Moreover, plaintiff's demand detailed how the Insider Selling Defendants were unjustly enriched by selling their personal Mannatech shares while in possession of adverse material non-public Company information about the status of Mannatech's business, operations and prospects for future growth.

60.    Plaintiff's demand requested that the Board take immediate action for existing and future damages concerning Mannatech's corporate image and exposure to violations relating to the dissemination of false and misleading public statements causing a massive drop in Company value.    Nevertheless, the Board notified plaintiff on November 10, 2005 that it would not immediately commence an action against the Company and instead created a Special Investigation Committee ("SIC"), which to date has rendered no finding on this matter. A true and correct copy of the Board's response is attached hereto as Exhibit B. Because of the extreme loss in Company value due to the dissemination of false and misleading public statements, the refusal to act regarding plaintiff's demand was wrongful and the result of fraud, bad faith and/or a gross abuse of discretion on the part of the Board. The Board has not taken any true action regarding plaintiff's demand because all of the allegations set forth herein are a direct result of their failure to properly oversee the Company and prevent misconduct. Plaintiff's demand was sent on September 14, 2005, and the mere fact that the SIC has yet to reach any conclusions or take any actions further demonstrates the Board's refusal to remedy the damage to the Company for which they are responsible.

61.    Accordingly, plaintiff is filing this action pursuant to Texas Business Corporation Act Article 5.14(C)(2) to avert irreparable injury that the Company is currently and will continue to suffer as a result of the Board's failure to act. Irreparable injury to the Company will result if this action does not proceed for, among others, the following reasons:

(a)    It is highly likely that the claim period during which a claim must be made against the Company's relevant directors' and officers' liability insurance policies will lapse. If such period does lapse, Mannatech will forever be prevented from making a claim against the Company's directors' and officers' insurance policies for the egregious misconduct, which resulted in massive damages to the Company;

(b)    If Mannatech's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Mannatech's. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by Mannatech against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Mannatech, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Mannatech to sue them, since they will face a large uninsured liability;

(c)    In order to bring this action for breaching their fiduciary duties, the members of Mannatech's Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do. To the extent that defendants will not take the immediate actions necessary to protect and preserve the rights of plaintiff and the public shareholders of the Company, irreparable injury will occur as detailed in (a) and (b) above; and

(d)     The Company will suffer from what is known as the "liar's discount" for the near future due to being implicated in the securities fraud and regulatory actions. Unless plaintiff is able to effect some change at Mannatech, including replacing the conflicted Board members, the Company will have difficulty reissuing debt and/or will have to reissue it on unfavorable terms and will risk losing its credit facility.

62.     Despite the defendants having knowledge of the claims and causes of action raised by plaintiff, defendants have failed to take action and refused to seek to recover for Mannatech for any of the wrongdoing alleged by plaintiff herein.

## COUNT I

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

63.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

64.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Mannatech common stock on the basis of such information.

65.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Mannatech common stock.

66.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Mannatech common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

67.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled

to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

68.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.     The Individual Defendants owed and owe Mannatech fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Mannatech the highest obligation of good faith, fair dealing, loyalty and due care.

70.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

71.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

72.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Mannatech has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

73.     Plaintiff on behalf of Mannatech has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Mannatech, for which they are legally responsible.

76. As a direct and proximate result of the Individual Defendants' abuse of control, Mannatech has sustained significant damages.

77. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

78. Plaintiff on behalf of Mannatech has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

79. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Mannatech in a manner consistent with the operations of a publicly held corporation.

81. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Mannatech has sustained significant damages in excess of hundreds of millions of dollars.

82. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

83. Plaintiff on behalf of Mannatech has no adequate remedy at law.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

84. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85. As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Mannatech to waste valuable corporate assets by paying incentive based

bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

86.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

87.     Plaintiff on behalf of Mannatech has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

88.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Mannatech.

90.     Plaintiff, as a shareholder and representative of Mannatech, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Directing the Individual Defendants to take all necessary actions to reform and improve Mannatech's corporate governance and internal procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking

such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

      1.    a proposal to strengthen the Boards' supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.    a provision to permit the shareholders of Mannatech to nominate at least three candidates for election to the Board;

      3.    appropriately test and then strengthen the internal audit and control functions; and

      4.    control and limit insider stock selling;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Mannatech has an effective remedy;

D.    Awarding to Mannatech restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 13, 2006

                        LAW OFFICES OF BALON B. BRADLEY
                        BALON B. BRADLEY
                        State Bar No. 02821700

                        _____
                        BALON B. BRADLEY

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5473 Blair Road, Suite 100
Dallas, TX  75231
Telephone:  972/991-1582
Facsimile:  972/755-0424

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile:  619/525-3991

Attorneys for Plaintiff

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

G \Cases\Mannatech\Complaints\Derivative\Nystrom Der Cpt ND Tex doc

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

EXHIBIT    A

## VERIFICATION

I, FRANCES NYSTROM, have read the Mannatech, Inc. Verified Shareholder Derivative

Complaint and know the contents thereof. The Complaint is true and correct to the best of my

knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _12-20-05_____

_Frances Nystrom_
FRANCES NYSTROM

EXHIBIT   B

# ROBBINS UMEDA & FINK, LLP
### ATTORNEYS AT LAW

BRIAN J. ROBBINS
MARC M. UMEDA
JEFFREY P. FINK

OF COUNSEL
BENJAMIN ROZWOOD

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

CAROLINE A. SCHNURER
KELLY M. McINTYRE
LOUIS A. KERKHOFF
STEVEN R. WEDEKING

September 14, 2005

**VIA CERTIFIED MAIL**

Board of Directors
c/o Samuel L. Caster
Chairman of the Board
MANNATECH, INC.
600 S. Royal Lane, Suite 200
Coppell, TX 75019

> Re:  *Shareholder Demand Letter Pursuant to Tex. Bus. Corp. Act Art. 5.14*

Dear Ladies and Gentlemen:

We represent Frances Nystrom, a shareholder of Mannatech, Inc. ("Mannatech" or the "Company"). Mr. Nystrom is concerned about the damage done to Mannatech as a result of the false and misleading statements Mannatech's Board of Directors (the "Board") and senior officers ("Officers") caused or allowed the Company to make concerning Mannatech's business prospects as well as concealing improprieties by its sales associates, between August 2004 and the present (the "Relevant Period").

The false and misleading statements the Board and Officers caused or allowed the Company to make resulted in unwarranted market optimism. In turn, Mannatech's stock traded at substantially inflated prices until May 9, 2005, when the shocking truth about Mannatech's true business prospects and the improprieties of its sales associates was revealed to the public. On that day, the investment community learned via an article published by *Barron's* about, the truth concerning Mannatech's sales associates' methods and their "seemingly irrepressible inclination ... to make extraordinary therapeutic claims for the supplements," which had "irked some foreign regulators." The article also discussed a civil suit filed in Los Angeles County against Mannatech for "negligent misrepresentation" and "conspiracy to commit fraud" stemming from alleged misconduct by its sales associates. Immediately following the publishing of this article, Mannatech's stock fell to as low as $11.64 per share on May 10, 2005 before closing at $12.15 per share on volume of 2.2 million shares. This share price was a far cry from the Relevant Period high share price of $26.04. The artificial inflation of Mannatech's share price allowed its Officers to reap $3.7 million in insider trading proceeds.

*Mannatech, Inc.*
September 14, 2005
Page 2

There can be no doubt that Mannatech's Board has been delinquent in its management and oversight of the Company by condoning the false and misleading statements concerning its business prospects and declining sales. Mr. Nystrom now demands that the Board take steps to address and remedy the harm inflicted on Mannatech as a result of the Board's misconduct.

The Company's top officers and directors violated their fiduciary duties to Mannatech by causing or allowing the Company to issue false and misleading press releases which intentionally concealed the Company's business prospects and the improprieties of its sales associates.

On August 10, 2004, the Board and Officers caused or allowed Mannatech to issue a press release announcing its 2Q:04 earnings. The press release stated in part:

> Mannatech, Incorporated today announced record sales and net income for its second quarter ended June 30, 2004. For the three months ended June 30, 2004, net sales reached $74.3 million, which was an increase of 59.8% from $46.5 million for the same period in 2003 and net income increased by 376.1% to $5.6 million or $0.20 earnings per share (diluted), as compared to $1.2 million or $0.04 earnings per share (diluted) for the same period in 2003. For the first six months of 2004, net sales increased by 52.5% to reach $132.7 million and net income increased to $8.7 million, or $0.32 earnings per share (diluted), compared to sales of $87.0 million and net income of $2.6 million, or $0.10 earnings per share (diluted) for the same period in 2003.

In the press release, Samuel L. Caster ("Caster"), Chairman of the Board and Chief Executive Officer ("CEO") of Mannatech, stated:

> "Our record performance, with sales growth of 59.8% and net income increasing 376.1%, is a testament to Mannatech's products, our Associates and the future of the Company. Along with this tremendous growth in our current markets, we are excited about introducing Mannatech products to South Korea when we plan to open for business in September 2004. Another sign of our strong trend is our increase in pack sales, which increased by 101.8% in the second quarter of 2004 as compared to 2003. Pack sales, which are regarded as a leading indicator for Mannatech, include signups, renewals, and upgrades, and our higher priced pack choices include various product selections as well as sales materials. New Associates are joining our company at a record rate, and we look forward to adding South Korea to our family of markets."

On November 9, 2004, the Board and Officers caused or allowed Mannatech to issue a press release announcing its 3Q:04 earnings. The press release stated, among other things:

> Mannatech, Incorporated today announced record sales and earnings for its third quarter ended September 30, 2004 as compared to the same period in 2003. For the three month period ended September 30, 2004, sales reached $77.6 million, a new

*Mannatech, Inc.*
September 14, 2005
Page 3

quarterly sales record for Mannatech, which was an increase of $27.8 million, or 56.1%, as compared to the prior year. Net income rose to $6.8 million, which more than doubled versus the same period in 2003. Net income as a percentage of net sales increased to 8.8% of net sales as compared to 5.8% for the same period in 2003. Earnings per share (diluted) for the third quarter of 2004 increased to $0.25 per share, which was an increase of 127.3% as compared to the prior year.

Sales for the nine months ended September 30, 2004 were $210.2 million, up 53.8% versus 2003. Net Income reached $15.5 million, which was an increase of $10.0 million or 183.4% over last year, while earnings per share (diluted) for the nine months ended September 30, 2004 was $0.57, again of 171.4% as compared to the same period in 2003.

The third quarter results represented a new quarterly record and marks Mannatech's eighth consecutive quarter of successive sales increases, during which time sales have more than doubled.

In the press release, Caster stated:

"We have seen our business grow rapidly and successfully for the past eight quarters, through the tremendous labors of our Associates around the world in concert with the highly focused and motivated activities of our corporate staff. We have also seen our sales double since the string of successive quarterly increases began in the fourth quarter of 2002. This strong trend is rewarding to us, and yet we believe that we have just begun to realize the potential of the products Mannatech brings to the world. We intend to continue our growth into new markets around the globe, and we welcome into the Mannatech family the Associates in our newest market in South Korea, which opened in September, 2004."

On March 10, 2005, the Board and Officers caused or allowed Mannatech to issue a press release announcing its FY:04 and 4Q:04 earnings. The press release stated, among other things:

Mannatech, Incorporated today announced the achievement of new annual sales and profit records for 2004. Consolidated net sales reached a new high of $294.5 million, an increase of $103.5 million, or 54.2%, as compared to 2003. Mannatech's net income of $19.6 million more than doubled as compared to the prior year with an increase of $10.8 million, or 122.4%, and earnings per share of $0.71 (diluted) increased 108.8% as compared to 2003.

\* \* \*

Fourth quarter results also included a new consolidated net sales record of $84.2 million for Mannatech, which was an increase of $29.9 million, or 55.1%, as

Mannatech, Inc.
September 14, 2005
Page 4

compared to the same period in 2003. Fourth quarter net income was $4.0 million, or $0.15 earnings per share (diluted), which was an increase of 21.9 % over the fourth quarter of 2003. Net income for the fourth quarter included one-time non-cash charge, totaling $3.0 million, or $0.07 per diluted share, net of tax, related to Mr. Caster's sale of 180,000 shares of his common stock to a former employee, Dr. H. Reginald McDaniel. The sale was for a price that was below the fair market value of Mannatech's stock on the date of the sale.

In the press release Caster stated:

"We are extremely pleased with the financial gains and continued strength shown throughout 2004, and also are delighted with the impressive sales momentum generated by our 369,000 current independent Associates and members around the world. Our groundbreaking glyconutritional technology continues to bring hope, health, and opportunity to people in record numbers and we believe that we are just scratching the surface of the potential of Mannatech."

On March 31, 2005, the Board and Officers caused or allowed Mannatech to file with the Securities and Exchange Commission ("SEC") a Form 10-K for FY:04. The filing represented the following:

All of Mannatech's associates are independent contractors who are contractually bound to follow certain policies and procedures. These policies and procedures help Mannatech ensure the legality of its independent associates' activities by requiring associates to comply with regulatory guidelines and act in a consistent, professional manner.

\* \* \*

*Management of Independent Associates.* Mannatech takes an active role in the oversight of its independent associates. Mannatech tries to ensure that its independent associates' conduct complies with applicable laws and regulations governing the sale of its products and the promotion of its business opportunities by contractually binding its independent associates to abide by Mannatech's policies and procedures for its independent associates and members. Mannatech provides each independent associate with a copy of its policies and procedures upon signing up as an independent associate and uses various media formats to distribute changes to its policies and procedures that must be followed in order to remain compliant with respect to Mannatech's policies and procedures, including publishing the changes in a newsletter, posting the changes on its corporate website, and announcing the changes at various educational meetings, seminars, and webcasts. Furthermore, Mannatech's legal/compliance department periodically monitors its independent associates' websites for content. In an effort to decrease the number of independent

*Mannatech, Inc.*
September 14, 2005
Page 5

websites owned by its independent associates and to preserve and protect its trademarks, Mannatech offers Mannapages™. Mannapages™ is a standardized personal Internet website program created to help its independent associates with their sales efforts, provide consistent standardized information and education, and assist Mannatech in monitoring websites of its independent associates.

On May 9, 2005, the Board and Officers caused or allowed Mannatech to issue a press release announcing the Company's 1Q:05 earnings. The press release stated among other things:

Mannatech, Inc. today announced record first quarter financial results. For the three months ended March 31, 2005, consolidated net sales increased 46% as compared to the prior year quarter to reach a new quarterly record of $85.1 million. In addition current independent Associates and members totaled 401,000 and reached a new record level.

* * *

The strong sales trend for the first quarter of 2005 resulted in record-setting sales and earnings as well as with net income of $4.7 million up 50% from a year ago and diluted earnings per share of $0.17, which increased by 55% as compared to $0.11 per share for the first quarter of 2004.

In the press release Caster stated:

"We have now completed ten consecutive quarters of sales increases and during this period our quarterly volume has grown 245% to reach a new quarterly record of $85.1 million. Our current independent Associate count as of March 31, 2005 grew 210% over the same ten quarters. Our recent new product introduction of Advanced Ambrotose(TM) has become one of our best-sellers, since its introduction in March 2005. Our earnings are growing at an accelerated rate, and we have a new market opening planned in June 2005 with Taiwan and plan to distribute our products in Germany and Denmark later in 2005. We believe, the future has never looked better for Mannatech, and we intend to continue to build further on the successes of the past ten quarters."

However, the true facts, which were known or should have been known by the Board and Officers, were concealed from the investing public during the Relevant Period. Specifically, the Board and Officers knew or should have know that: (i) the Company was at least tacitly encouraging associates to make misleading claims about the Company's products; (ii) contrary to defendants' claims of fiscal 2005 growth and profitability, the Company would experience much worse results once its misleading practices were disclosed; (iii) the Company lacked the controls to prevent false statements by associates; and (iv) the Company's earnings were based on misleading claims about the efficacy of its products.

*Mannatech, Inc.*
September 14, 2005
Page 6

As a result of the misconduct described herein, Mannatech has been named in large and costly class action securities fraud lawsuits. These actions have collectively exposed the Company to millions of dollars of potential liability. Mannatech's demise is directly traceable at least to the Company's Officers and directors, who failed to fulfill their fiduciary duties to properly oversee and govern the Company's operations. As a proximate cause of the Officers' and directors' misconduct, greed and avarice, Mannatech's once valuable enterprise and reputation has been irreparably tarnished by the refusal of the Board to keep the Company in compliance with applicable state and federal laws and to abstain from looting the Company. Our analysis indicates that Mannatech has suffered millions of dollars worth of damage and that the self-dealing behavior engaged in by Mannatech's directors and Officers in response to this crisis have only compounded these problems. The Board's unwillingness to remedy the source of these problems, in fact, threatens to destroy this once valuable research-based company.

It is time for Mannatech to be made whole and liberate itself from the selfish, imprudent governing to which it has been subjected. Mr. Nystrom demands that the Company commence legal proceedings against each Mannatech Board member and senior Officer who served during the Relevant Period for their breaches of fiduciary duty to the Company including the duty of loyalty and due care for: (i) causing the Company to engage in unlawful conduct or failing to properly oversee the Company's press releases and internal controls to prevent such misconduct; (ii) causing the Company to issue false and misleading statements; and (iii) exposing the Company to staggering potential liability for the foregoing violations. The legal proceedings should seek recovery of illegal insider sales proceeds as well as millions of dollars in salaries, bonuses, retirement benefits and long term compensation paid to directors and Officers in connection with their past and ongoing wrongdoing.

In making the foregoing demands to commence litigation, our client does not concede that the Board or any member thereof is independent or competent to consider these demands.

Our client, Frances Nystrom, as a Mannatech shareholder, thanks you for your prompt attention to this serious matter. It is incumbent on Mannatech's Board to do the right thing and hold accountable all those responsible for the harm done to Mannatech and to ensure a prosperous future for the Company by restoring its reputation.

If you have any requests, questions, or concerns, please do not hesitate to contact us.

Very truly yours,

JEFFREY P. FINK

JPF/cd

EXHIBIT    C



*Bettina S. Simon*
Senior Vice President & General Counsel
Direct Dial: 972.471.7388
Direct Fax: 972.471.7387
Email: bsimon@mannatech.com

November 10, 2005

Jeffrey P. Fink, Esq.
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101

Re:   Shareholder Demand Letter Pursuant to Tex. Bus. Corp. Act Art. 5.14

Dear Mr. Fink:

As General Counsel for Mannatech, Inc. and on behalf of its Board of Directors, I am acknowledging receipt of your letter dated September 14, 2005 addressed to the Board of Directors.

In response to your letter a Special Litigation Committee of disinterested and independent directors pursuant to Texas law has been formed and will review the matters you have raised. The Committee has now engaged counsel, Robert Crotty, Esq., who I assume will be in contact with you.

You should also be made aware that a shareholder derivative lawsuit was filed in the United States District Court for the Northern District of Texas on October 18, 2005 in Civil Case No. 3-05CV2059-K, styled *Norma Middleton, Derivatively and on behalf of Nominal Defendant, Mannatech, Inc., Plaintiff vs. Samuel L. Caster, et al., Defendants*. William B. Federman, Federman & Sherwood, 120 N. Robinson, Suite 2720, Oklahoma City, OK 73102 is counsel for the Plaintiff.

Please let me know if you have any questions or comments.

Sincerely,

Bettina S. Simon
Senior Vice President and General Counsel

cc: Board of Directors

ⓈJS 44 (Rev 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)    PLAINTIFFS**

FRANCES NYSTROM

**DEFENDANTS**

SAMUEL L. CASTER, et al.,
and MANNATECH, INCORPORATED

**3-06CV-0093G**

**(b)**   County of Residence of First Listed Plaintiff     San Diego, California
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant     Dallas ,Texas
(IN U.S. PLAINTIFF CASES ONLY)
NOTE  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

**(c)**   Attorney's (Firm Name, Address, and Telephone Number)

Balon B. Bradley,  5473 Blair Road, Suite 100
Dallas, TX  75231

Attorneys (If Known)

RECEIVED
JAN 13 2006
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**II. BASIS OF JURISDICTION**   (Place an "X" in One Box Only)

☐ 1   U S Government Plaintiff

☐ 2   U.S. Government Defendant

☐ 3   Federal Question
(U S  Government Not a Party)

☒ 4   Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R. R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt  Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN**   (Place an "X" in One Box Only)

☒ 1   Original Proceeding
☐ 2   Removed from State Court
☐ 3   Remanded from Appellate Court
☐ 4   Reinstated or Reopened
☐ 5   Transferred from another district (specify)
☐ 6   Multidistrict Litigation
☐ 7   Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity).

Brief description of cause:   SHAREHOLDER DERIVATIVE SUIT

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions)

JUDGE     Ed Kinkeade

DOCKET NUMBER     3:05-cv-02059

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE